# THE ATTORNEY GENERAL,
## OF TEXAS

Gerald C. Mann

~~XXXXXXXX XXXXXXXX~~
ATTORNEY GENERAL

AUSTIN 11, TEXAS



Honorable B. F. McKee
County Auditor
Hidalgo County
Edinburg, Texas

Dear Sir:

Opinion Number 0-4816
Re: Under the facts set forth do
the discounts correctly be-
long to the State of Texas or
to the Hidalgo County issue
when the sinking fund of the
Hidalgo County issue supplied
the funds from which the pur-
chases of bonds were made?

We have your letter stating certain facts and requesting
our opinion on the question stated. We quote from your letter as follows:

"Hidalgo County has outstanding an issue of Road
and Bridge Bonds dated June 15, 1932, and maturing April
1, 1952 and it has been determined by the Board that the
issue is 55% eligible for participation in the County and
Road District Highway Fund. Inasmuch as the issue was
in the original amount of $1,099,000 and is a 'term' issue
with no serial principal maturities, the Board has each
year from 1933 to 1942 inclusive transferred from its
available fund known as 'County and Road District High-
way Fund' the sum of $30,222.50 to a fund known as
'Hidalgo County Road and Bridge Refunding Bonds -
Series 1932 - Sinking Fund', Under the provisions of
Section 6 (M) of the Road Board Act which reads in part
as follows:

" '* * * The Board of County and District Road In-
debtedness shall have and possess full authority to invest
all such sinking funds * * * in any eligible obligations of
the various political sub-divisions of this State, which ma-
ture within the current biennium in which such securities
are purchased and where there is on hand a sufficient
amount of moneys or securities to the credit of any one
political sub-division to retire some of its obligations,

whether then due or not, the Board of County and District
Road Indebtedness may, if it deems it advisable, purchase
and cancel said obligations of such particular political sub-
division, irrespective of maturity dates * * * '

"the Board has purchased various amounts of this issue
from the funds so transferred, at various prices for can-
cellation. Due to the fact that the bonds were purchased
at a discount in the total amount of $44,097.87 we will ap-
preciate your opinion as to whether or not the discounts
correctly belong to the State of Texas or to the Hidalgo
County issue, when the sinking fund of the Hidalgo County
issue supplied the funds from which the purchases of bonds
were made."

The general purpose of the State Aid Act is to repay the
various counties and road districts for sums advanced for the construc-
tion of State highways. The Legislature did not make a gift or donation
but undertook to fairly, justly and equitably compensate the counties
and defined road districts, as stated in the following excerpt taken from
Section 1 of the Act itself:

" * * * And it is hereby determined that the fur-
ther provisions of this Act constitute fair, just, and equit-
able compensation, repayment, and reimbursement to said
counties and defined districts and for their aid and assist-
ance to the State in the construction of State Highways and
for the construction of said roads which are ancillary to,
but do not constitute a part of said system of State Highways,
and fully discharges the legally implied obligations of the
State to compensate, repay, and reimburse the agencies of
the State for expenses incurred at the instance and solicita-
tion of the State, as well as for expenses incurred for the
benefit of the State, and fully discharges the State's legally
implied obligation to such counties and defined road dis-
tricts to provide additional funds for the further construc-
tion of roads not designated as a part of the State Highway
System."

The extent of State eligibility or of its "legal and moral
obligation" to compensate and reimburse such counties and defined road
districts is clearly defined in Section 6(a) of the Act which reads in part
as follows:

"All bonds, warrants or other evidences of in-
debtedness heretofore issued by counties * * * which
mature on or after January 1, 1933, insofar as amounts
of same were issued for and the proceeds have been actu-
ally expended in the construction of roads that constituted

and comprised a part of the system of designated
State Highways on September 17, 1932 * * * shall
be eligible to participate in the distribution of the
moneys coming into said County and Road District
Highway Fund * * * ".

It was under this provision that the State Board ascertained
and determined that 55% of the original amount of the issue under con-
sideration had been expended upon roads that constituted a part of the
State Highway System.

Subsection (c) of Section 6 provides, in part:

"It shall be the duty of the Board of County
and District Road Indebtedness * * * to ascertain
and determine the amount of indebtedness eligible
under the provisions of this Section * * * to parti-
cipate in the moneys coming into said County and
Road District Highway Fund * * * And said obliga-
tion to said amount and extent shall be eligible for
participation in the moneys coming into the County
and Road District Highway Fund and ascertainment
and determination shall be certified to the County
Judge by said Board and all of the unmatured out-
standing obligations of said issue shall ratably have
the benefit of said participation in said moneys * * *
The ascertainment and determination by the Board,
after reasonable notice and hearing, of the amount
of any county or defined road district obligation el-
igible under the provisions of this Act * * * shall
be final and conclusive and shall not be subject to
review in any other tribunal."

Subsection (j) of Section 6 of House Bill 6 of the Forty-
seventh Legislature reads in part as follows:

"All moneys to be deposited to the credit of
the County and Road District Highway Fund from
September 1, 1941 to August 31, 1943, both inclusive,
are hereby appropriated to said respective counties
and road districts and shall be received, held, used
and applied by the State Treasurer as Ex-officio
Treasurer of said respective counties and defined
road districts. * * * And each year thereafter until
all of said eligible obligations are fully paid, all
moneys coming into the credit of the County and
Road District Highway Fund with the State Treasurer
and all moneys remaining therein from the previous
year shall be received and held by him as Ex-officio
Treasurer of such counties and defined road districts.
* * * "

Subsection (p) of Section 6 reads as follows:

"In the event this Act is repealed, or shall be-
come inoperative as to any county or defined road dis-
trict, then it shall be the duty of the Board to ascertain
immediately the amount of moneys remaining on hand
with it or with the State Treasurer belonging to the sev-
eral counties or defined road districts affected, and
forthwith to return the same to the County Treasurer
of the county entitled thereto, accompanied by an item-
ized statement of the account of the county or defined
road district."

It will be noted in Subsection (j) hereinabove quoted that
the Legislature has expressly appropriated all moneys to the credit of
the said counties and defined road districts and commands that it shall
be received, held, used and applied by the State Treasurer as Ex-officio
Treasurer of such counties for the purposes and uses specifically set
forth in the Act and has further expressly provided that until all such
obligations have been fully paid, the money coming into the County and
Road District Highway Fund and such money as remains therein from
the previous year are to be received and held by the State Treasurer as
Ex-officio Treasurer of the county. This section seems clearly to char-
acterize these funds as county funds. Subsection (p) seems to confirm
the conclusion reached in the next preceding paragraph. It provides that
the money remaining with the State Treasurer belonging to the several
counties shall be returned to the County Treasurer, whenever the Act is
repealed or shall be or become inoperative.

Subsection (q) reads as follows:

"All funds on hand belonging to, and hereafter
credited to, the several counties and defined road dis-
tricts of the State, shall be considered State funds, and
as such shall be deposited at intervals in the deposit or-
ies provided for by the State laws, and all interest earned
on such funds and on the securities in which they are in-
vested shall belong to said counties or defined road dis-
tricts, and shall be credited to them by the State Treas-
urer as earned and collected."

Since the Legislature has declared that the interest on such
funds shall belong to the counties, it is manifest that the funds belong to
the counties, since the counties would not be entitled to interest earned
on State funds.

It seems clear to us that the Board used funds belonging to
Hidalgo County when it purchased and cancelled the bonds referred to in
your letter, since the only authority we find in the Act for retiring un-
matured bonds is found in Section 6 (m) which reads, in part, as follows:

" * * * The Board of County and District Road Indebtedness shall have and possess full authority to invest all such sinking funds, including all future sinking funds acquired in any manner whatsoever, in any eligible obligations of the various political subdivisions of this State, which mature within the current biennium in which such securities are purchased, and where there is on hand a sufficient amount of moneys or securities to the credit of any one political subdivision to retire some of its outstanding obligations, whether due or not, the Board of County and District Road Indebtedness may, if it deems advisable, purchase and cancel said obligations of such political subdivision, irrespective of maturity dates * * * ."

This subsection (m) authorizes the Board to invest any of the sinking funds in any eligible obligations of the various subdivisions which mature within the biennium in which the investment is made, but only authorizes the purchase and cancellation of unmatured bonds when it uses the funds belonging to the particular county or subdivision whose bonds are thus purchased and cancelled. No authority is found to retire obligations from any other fund. The purchases and cancellation of the bonds in question have been from funds of a particular subdivision, and the instant bonds are eligible in a certain percentage of their par value. If any of the bonds are acquired at less than their par value we think the saving should accrue to the county, and that the Board will still be obliged to pay such portion of the debt as it had previously determined to be eligible for participation.

At the time the bonds were made eligible for participation the Board set aside such funds as were contemplated to properly reimburse and compensate the county, and such previously determined obligation cannot be affected by a subsequent diminishing of the county's portion of the bonds.

You are, therefore, advised that in our opinion the payment by the State should be made on the basis of the par value of the bonds.

We are attaching a copy of our Opinion Number 0-3623, which deals with a somewhat similar question.

Very truly yours

Approved SEP 23, 1942

ATTORNEY GENERAL OF TEXAS

/s/ Gerald C. Mann
Attorney General of Texas

By /s/ C. F. Gibson
   C. F. Gibson
    Assistant

CFG/s:cm
Encls.

     This Opinion
Considered and approved in limited
     conference.